IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CANDACE TYLER, | CIVIL DIVISION |
| Plaintiff, | Case No.   22-1092 |
| v. | |
| CITY OF McKEESPORT, | |
| Defendant. | |

### COMPLAINT AND JURY DEMAND

A.   *Preliminary Statement*

1.   The plaintiff Candace Tyler brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of her right to be free from employment discrimination, harassment and retaliation based upon her race and gender. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* A jury trial is demanded.

B.   *Jurisdiction*

2.   The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3.   On or about January 24, 2022, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2022-00219. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4.   The EEOC issued a Notice of Right to Sue dated May 4, 2022.

5. This Complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C. *The parties*

6. The plaintiff is an adult individual who resides in McKeesport, Allegheny County, Pennsylvania.

7. The defendant City of McKeesport is a Third Class City within Allegheny County, Pennsylvania. The McKeesport Police Department (the "Department") is comprised of approximately 38 full-time officers and four part-time officers. At all times material, the defendant had a place of business located at within this district, specifically 500 5th Avenue, McKeesport, Allegheny County, Pennsylvania 15132.

8. At all times material, the defendant employed more than fifteen employees.

9. The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D. *Factual Background*

10. The plaintiff (African American) was employed by the defendant from November 2005 through October 19, 2021.

11. The plaintiff was first employed as a patrol officer. Her job duties included patrolling the streets, responding to calls involving domestic issues and other matters and issuing traffic citations.

12. Throughout her career as a police officer, the plaintiff performed all the functions of her job in a competent fashion and was a good worker.

13. Adam Alfer (Caucasian) was the Chief of Police. Mark Steele (Caucasian) was the Assistant Chief. Ryan Miller (Caucasian) was a Sergeant in the patrol unit. Terry

Brownfield (African American) was a Lieutenant in the patrol unit. Francis Angert (Caucasian) was a Lieutenant in the Patrol Unit.

14. While she was an employee, the plaintiff was subjected to discriminatory treatment by management on account of her race and gender, treated differently than similarly situated white employees and males and her termination was a result of a discriminatory animus and in retaliation for making complaints about being discriminated against.

15. Despite her long tenure working for the defendant, the plaintiff had not received any promotions or opportunities for advancement within the Department. She brought the issue up to those in her chain of command from time to time but was always given various excuses about why she had not been considered for or given a promotion.

16. In February 2021, she had yet another conversation with Assistant Chief Steele about why she had not been considered for a promotion. Seemingly frustrated with the plaintiff's persistence, Assistant Chief Steele told her, "We are not going to promote black females." The plaintiff was shocked by this statement.

17. The plaintiff decided to file a grievance. In accordance with the applicable procedure to do so, the plaintiff prepared a grievance on March 17, 2021 and hand-delivered it to the Chief Alfer's office. According to the procedures regarding grievances, Chief Alfer was required to respond to the grievance within five days by returning a copy of the form to the grievant. The grievant would then deliver a completed copy to the union. At that point, the union would meet with management in an attempt to resolve the grievance or to take further action to have the grievance arbitrated. Chief Alfer never returned the grievance with his response to the plaintiff.

18. In approximately May 2021, she found a graphic and pornographic "selfie" copy of a photograph in her office mailbox of Officer Tubin, shirtless and with his underwear pulled down below his hip, holding his penis in his hand. She went to Lt. Brownfield and showed him the photograph. Sgt. Miller was also present. Lt. Brownfield just shook his head and Sgt Miller went to grab the photograph out of the plaintiff's hand, saying, "I'll take care of that." The plaintiff knew that Sgt. Miller wanted to take possession of the copy to destroy it. The plaintiff told him that she would not give him the printed photograph and that she wanted something done about the situation. She was told that it was just a joke and to let it go.

19. To the plaintiff's knowledge, no investigation was undertaken to find out who had put the copy of the photograph in the plaintiff's mailbox and no one was disciplined.

20. The plaintiff believed this photograph had been put in her mailbox because she had been advocating on her own behalf to seek advancement in the Department. Management and other male police officers did not want a black female to be promoted and someone did this as a form of intimidation and retaliation.

21. The plaintiff was additionally retaliated against by being taken off patrol and placed at the Warden's desk.

22. Sgt Miller seemed to be leading the charge to get the plaintiff terminated from her job. He subjected her to personal verbal attacks, subjected the plaintiff to heightened scrutiny and wrote her up for alleged infractions of Department rules and policies, despite the fact that similarly situated white male officers engaged in similar conduct but were not disciplined.

23. Sgt. Miller continued to harass the plaintiff through the Spring and Summer of 2021.

24. On July 20, 2021, the plaintiff prepared a grievance regarding the hostile work environment to which she was being subjected and delivered it to Chief Alfer's office on July 22, 2021. Again, no action was taken on this grievance. Instead, the campaign of retaliation intensified.

25. Between September 22, 2021 and October 4, 2021, Sgt. Miller filed approximately six "police reports" against the plaintiff detailing incidents where the plaintiff had allegedly placed officers' lives in danger or had otherwise engaged in rules and policy infractions. Lt. Angert filed one "police report" against the plaintiff claiming that she failed to follow the policy manual regarding reporting a call to have a rape kit picked up.

26. Based on these incidents, the defendant took action to end the plaintiff's employment. Notably, the progressive discipline policy contained in the collective bargaining agreement was not followed. Instead, the defendant decided to forego the warnings and other steps and move straight to termination. A Loudermill hearing was held on October 15, 2021 and, on October 19, 2021, the plaintiff's employment was terminated. In pertinent part, the termination letter provided as follows:

> *At [the Loudermill hearing] we reviewed numerous examples of gross insubordination, dereliction of duties, conduct unbecoming of an officer, actions placing other officers at risk and dishonesty. ... Your disregard for the truth and your apparent inability to follow the most basic of our departmental procedures has resulted in officers being put in danger of serious bodily harm.*

27. The reasons given for the plaintiff's termination were nothing more than pretexts and the real reason that she was fired was because of her race and gender. Further, the plaintiff was terminated in retaliation for raising the issue of not being promoted due to her gender and her being subjected to discriminatory and harassing treatment due to her race and gender to management.

28.  One of the alleged incidents in which Sgt. Miller claimed that the plaintiff had put officers' lives in danger is noteworthy and illustrates how all the incidents were used as pretexts to terminate her employment.

29.  Specifically, on September 14, 2021, the plaintiff, Sgt. Miller and Officer Sam Bostic went to a residence to serve Protection from Abuse ("PFA") eviction papers on Person X (male).  Upon arrival, Person X opened the door and Sgt. Miller claimed that the plaintiff "did not explain" why they were there and merely said "you are evicted."  Officer Bostic followed up and advised Person X that they had the paperwork in the plaintiff's hand was a PFA eviction and then "informed [Person X] that he would need to get some belongings and exit the residence."  Person X did not resist, he admitted all three officers into the residence.

30.  Officer Bostic walked with Person X upstairs to the bedroom.  Sgt. Miller reported that shortly after Officer Bostic and Person X went upstairs, he heard the sound "like a slide of a handgun being racked."  According to his report, Sgt. Miller called up to Officer Bostic, "Is that a handgun I hear?" and Officer Bostic responded in the affirmative.  At that point, Sgt. Miller claimed that the plaintiff told him that the "PFA stated that [Person X] may have a gun."  In the report, Sgt. Miller stated that the plaintiff "placed all three of are [sic] lives in danger when she did not inform us that there was a possible gun owned by [Person X]."

31.  However, Officer Bostic did not believe that the plaintiff's actions put his life in danger.  Apparently, he was not interviewed by the defendant during any investigation into this incident.  In a statement provided as an exhibit to the plaintiff's charge of discrimination, he said:

> *I was not aware if there was … a relinquishment of a firearm or not.  I never had or read the PFA affidavit, however I was familiar with [Person X] because I had coached him in athletics.  When he opened the door, I informed him we were there to serve him a PFA paper, and he needed to vacate the premise* [sic].  *He stated he needed to go upstairs and gather some belongings.  I followed right*

*behind him. When we entered the bedroom, he went over to the closet, and I noticed a handgun laying on the bed. I grabbed it unloaded it and removed the magazine. Ofc. Taylor and Sgt. Miller were downstairs still at this time. When I racked the handgun to unload it Sgt Miller asked me what that was. I told him what I had come upon and he said we needed to take it into possession due to the PFA in general.* **At no time did I feel my life was in danger during this incident.**

Emphasis supplied.

32. Similarly situated white male police officers were not terminated, or even disciplined, for similar or more egregious lapses of conduct. For example, on December 20, 2020, Officers Jerry Athans, Eli Tubin, Josh Byers and Lt Josh Alfer (Chief Alfer's brother) were sent to respond to a call involving a violation of a PFA order by Koby Francis. They found Francis and put him into custody. Officer Athans transported Francis to the McKeesport police station. Upon arrival, Officer Athan went to open the passenger rear door. Francis pulled out a loaded handgun and shot at Officer Athan, hitting him two or three times in the neck and shoulder. Video of the incident showed that Francis was handcuffed as he fired the weapon, hands in front of him instead of behind his back. The proper protocol is to handcuff an individual behind the back, not in front. Further, the police department was at a loss to explain why Francis had a gun at the ready when Officer opened the door. The Department claimed that Francis was searched as he was taken into custody but did not explain how he was able to hide a gun on his person that eluded any such search. Clearly, this incident involved serious oversights by the officers in question and resulted in one officer being injured and nearly killed. None of the officers involved on that call were disciplined or terminated.

33. There is also a double standard – depending on race and gender – regarding issues of honesty. All police officers on the force are required to be residents within the City of McKeesport. However, several white officers are in violation of that policy and have never been disciplined or terminated.

7

34. Other officers are aware that the plaintiff was held to a different standard and singled out and that she was terminated for pretextual reasons. For example, Officer Julian Thomas provided a statement (attached as an exhibit to the plaintiff's charge of discrimination), in which he said:

> *This letter is to reference my individual interaction and observed experiences with officer Candace Tyler. This officer has on numerous occasions had the opportunity to work with and observe office Candace Tyler. Not in my presence nor during any of my observations has officer Candace Tyler ever acted carelessly or recklessly to an extent that she endangered the life of another officer. This officer has been made aware of by multiple officers including union stewards and supervisors the charge levied against officer Tyler.*
>
> *It is based off of this officer's knowledge of other individuals facing similar said charges that this officer believers Officer Tyler was unfairly terminated and should have been provided ample opportunity for corrections and retraining should he department have determined officer Tyler's actions were in violation of department policy. To speak plainly, other officers have done far worse and we're [sic] afforded the opportunity to serve a suspension and continue/finish their career. More often than not these opportunities were not afforded to Minorities and women within the department. The department has a long history of unfairly holding back women and minorities from training and promotional opportunities which this officer would gladly provide should it be requested.*

35. Detective Schelley Gould also provided a statement (attached as an exhibit to the plaintiff's charge of discrimination) that supports the conclusion that the Department's reasons for terminating the plaintiff are not worthy of belief:

> *I'm writing this letter in regards to Officer Candace Tyler whom is a very good officer and has been the entire time since she has worked for the McKeesport Police Department.*
>
> *Officer Tyler is always working and on time for her shifts. She has never shied away from her duties in any way. She works hard and has never placed any officer or officers in harms way*
>
> *I feel Officer Candace Tyler has been targeted because she stands up for herself and doesn't take any stuff from anyone. She is a joy to work with and an inspiration to others and we are lucky to have her on the department. I would work with her any day of the week!!*

**FIRST CAUSE OF ACTION**

36. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

37. The plaintiff is African American and a female and thus is protected against discrimination, harassment and retaliation on the basis of her race pursuant to Title VII.

38. The plaintiff was qualified for her position.

39. Despite her qualifications, the plaintiff was terminated. The reasons given for her discharge were a pretext.

40. The defendant's discharge of the plaintiff was because of her race and gender in violation of Title VII.

41. Further, the defendant retaliated against the plaintiff because she brought issues regarding discrimination to the attention of management, including lack of promotional opportunities for women and a hostile work environment.

42. The defendant's violation of Title VII was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of race and gender discrimination.

**SECOND CAUSE OF ACTION**

43. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

44. As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination, harassment and retaliation under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq*.

WHEREFORE, the plaintiff respectfully requests judgment be entered in her favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII and the PHRA, including attorney's fees and costs.

    Respectfully submitted,

    */s/ Michael J. Bruzzese*
    Michael J. Bruzzese
    Pa. I.D. No. 63306
    220 Koppers Building
    436 Seventh Avenue
    Pittsburgh, PA 15219
    (412) 281-8676
    Counsel for the plaintiff

Dated: July 28, 2022